IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MELISSA RILEY CAREY, as representative of
the estate of MATTHEW WALLACE RILEY,
and WALLACE RILEY,

     Plaintiffs,

                v.

THE GEORGIA DEPARTMENT OF
CORRECTIONS, ANTOINE CALDWELL,
ZELDA CUMMINGS, DR. SHARON LEWIS,
and JOHN and JANE DOE CORRECTIONS
OFFICERS 1-10,

     Defendants.

Civil Action No.
1:20-cv-02235-SDG

<u>OPINION AND ORDER</u>

This case is before the Court on Defendants' Motion for Summary Judgment
[ECF 76]. After careful consideration, the Court **GRANTS IN PART** Defendants'
motion and remands this case for further proceedings in the State Court of Fulton
County.

## I.    BACKGROUND

Unless otherwise noted, the following facts are undisputed or are supported
by undisputed evidence in the record. Matthew Riley was an inmate at Johnson
State Prison (JSP) in October 2017.[1] JSP is run by the Georgia Department of

---

[1]    ECF 77-2, ¶ 4.

Corrections (GDC). On October 17, 2017, medical staff were called to Riley's cell because he was exhibiting slurred speech and a change in behavior.[2] Riley was assessed by the medical staff, who suspected that he had possibly suffered a stroke.[3] He was then immediately transported to the emergency department at Fairview Park Hospital.[4] Warden Caldwell, who generally oversees JSP staff, was notified that Riley was being transferred to an outside provider, but he had no involvement in Riley's transfer and had no involvement in Riley's medical care after he was transferred.[5] A CT scan taken at Fairview showed both hemorrhaging and a mass in his brain.[6]

The next day, Riley was transported to Navicent Health because his condition required a higher level of care than was available at Fairview Park.[7] Upon his arrival, Riley was admitted to the Neurosurgical Intensive Care Unit for treatment.[8] The following day, October 19, a Navicent nurse contacted Denise

---

[2]   *Id*. ¶ 9.

[3]   *Id*. ¶¶ 10–12.

[4]   *Id*. ¶ 12.

[5]   ECF 76-2, ¶¶ 40-41.

[6]   ECF 77-2, ¶ 14.

[7]   *Id*. ¶ 15.

[8]   *Id*. ¶ 16.

Eady, a nurse with GDC's Utilization Management. Utilization Management coordinates medical care for inmates who require treatment from outside providers.[9] The Navicent nurse informed Eady that Riley needed to be transported to a hospital with brain mapping capabilities.[10] Eady testified that the Navicent nurse suggested transport to either Augusta University Medical Center ("AU") or Emory University Hospital.[11] Eady contacted AU, but they informed her that they did not have brain mapping capabilities.[12] Eady then called Dr. Sharon Lewis, the Statewide Medical Director of the GDC, to ask for her recommendation on where Riley should be transferred.[13] Lewis told Eady to call Atlanta Medical Center (AMC) because it had brain mapping capabilities as well as a forensic unit.[14] Based on the record, this was the extent of the phone call between Eady and Lewis. Plaintiffs contend Lewis suggested transfer to AMC based on financial considerations, but that issue is in dispute. Eady then called AMC, which accepted

---

[9]   *Id.* ¶ 18.

[10]  *Id.* ¶ 19.

[11]  ECF 77-6, ¶ 17.

[12]  ECF 77-2, ¶ 20.

[13]  *Id.* ¶ 21; ECF 77-6, ¶ 17; ECF 77-5, ¶ 27.

[14]  ECF 77-5, ¶ 27-28; ECF 77-2, ¶ 22.

Riley for transfer.[15] In Eady's efforts to coordinate transfer to AMC, it became apparent that AMC did not have a bed immediately available.[16] Between October 19 and October 20, 2017, Eady placed at least seven follow-up calls to AMC to inquire about Riley's transfer and the availability of bed space.[17] Based on the record, Eady only spoke to Dr. Henderson at AMC about this delay.[18] Riley was transferred to AMC on October 21 and died at 9:15 am that morning.[19]

On April 21, 2020, Riley's mother filed a Complaint in Fulton County State Court as a personal representative of Riley's estate.[20] She brought two counts: a state law claim under the Georgia Tort Claims Act against the GDC for failing to provide Riley with needed medical and hospital attention, and another pursuant to § 1983 against Dr. Sharon Lewis, Warden Antoine Caldwell, Zelda Cummings, and John Doe officers 1-10 for violation of Riley's Eighth Amendment rights by allegedly demonstrating deliberate indifference to his serious medical needs. Defendants removed the case to this Court on May 26 based on federal question

---

[15]   ECF 77-2, ¶¶ 22-23.

[16]   *Id*. ¶ 25.

[17]   *Id*. ¶ 24.

[18]   ECF 77-6, ¶ 19.

[19]   ECF 77-2, ¶ 26–27.

[20]   ECF 1.

jurisdiction for the § 1983 claim.[21] After discovery, Defendants filed the instant motion for summary judgment. The motion is fully briefed and ripe for consideration.

## II.    LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it can affect the outcome of the lawsuit under the governing legal principles. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party seeking summary judgment has the burden of informing the district court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If a movant meets its burden, the party opposing summary judgment must present evidence showing either (1) a genuine issue of material fact or (2) that the movant is not entitled to judgment as a matter of law. *Id.* at 324. In determining whether a genuine issue of material fact exists, the evidence is

---

21    *Id.*

viewed in the light most favorable to the party opposing summary judgment, "and all justifiable inferences are to be drawn" in favor of that party. *Anderson*, 477 U.S. at 255; *see also Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1246 (11th Cir. 1999). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions," and cannot be made by the Court in evaluating summary judgment. *Anderson*, 477 U.S. at 255. *See also Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). Summary judgment for the moving party is proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III.   ANALYSIS

As an initial matter, Plaintiffs admit that Zelda Cummings is not a proper Defendant and is entitled to summary judgment, as she was employed at a different GDC facility and had no involvement with Riley.[22] The Court agrees. It addresses the remaining claims separately below.

### a.   § 1983 Fictitious Party Claims

Fictitious-party pleading is generally not permitted in federal court. *Richardson v. Johnson*, 598 F.3d 734, 738 (11th Cir. 2010) (citing *New v. Sports &*

---

[22]   ECF 77, at 2 n.1.

*Recreation, Inc.*, 114 F.3d 1092, 1094 n.1 (11th Cir. 1997)). However, there is "a limited exception to this rule when the plaintiff's description of the defendant is so specific as to be, 'at the very worst, surplusage.'" *Id.* (quoting *Dean v. Barber,* 951 F.2d 1210, 1215-16 (11th Cir. 1992)). That is not the case here.

The First Amended Complaint lists John and Jane Does 1–10 as Defendants but does not describe them with any specific detail. Beyond Plaintiffs' statement that the Does are unidentified employees of JSP,[23] the pleading alleges that "John Doe Corrections Officers 1-10 . . . were intentionally or deliberately indifferent to Riley's serious medical needs by repeatedly delaying, denying, and refusing him essential medical treatment, in violation of Riley's rights under the United States Constitution, Amendment VIII."[24] However, these vague references do not describe the Does in a manner sufficient to warrant application of the exception to the general rule against fictitious-party pleading. No additional evidence identifies the Does to whom Plaintiffs are referring. Therefore, the Court finds that the Doe Defendants are not proper parties in this action and dismisses the claims against them.

---

23    ECF 72, ¶ 8.

24    *Id*. ¶ 42.

**b.    Warden Caldwell and Dr. Lewis are entitled to qualified immunity on Plaintiffs' § 1983 claims.**

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223 (2009). To apply this doctrine, the official must have been engaged in a "discretionary function" when he performed the acts of which the plaintiff complains. *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982) (holding that qualified immunity extends to "government officials performing discretionary functions"). In *McCoy v. Webster,* 47 F.3d 404, 407 (11th Cir. 1995), the Eleventh Circuit interpreted "the term 'discretionary authority' to include actions that do not necessarily involve an element of choice," and emphasized that, for purposes of qualified immunity, a governmental actor engaged in purely ministerial activities can nevertheless be performing a discretionary function. In other words, instead of focusing on whether the acts in question involved the exercise of actual discretion, courts should assess whether they are of a type that fall within the employee's job responsibilities. *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004).

Once the government employee establishes that she was acting within her discretionary authority, the burden shifts to the plaintiff to show that qualified

immunity is not appropriate. *Lee v. Ferraro*, 284 F. 3d 1188, 1194 (11th Cir. 2002). An officer is not entitled to qualified immunity if her actions (1) violated a constitutional right; and (2) "the unlawfulness of [her] conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). If the plaintiff prevails on both prongs of this test, then the employee is not entitled to qualified immunity.

Defendants argue that both Caldwell and Lewis were acting within the scope of their discretionary authority. The Court agrees. In fact, Plaintiffs never argue that either Defendant was acting outside of his or her job function. Plaintiffs connect Caldwell to this case by arguing that he supervised staff who made medical decisions. To the extent that his supervision of those staff members is his connection to this case, Plaintiffs do not deny that his actions fell within his job responsibilities[25] such that he can invoke a qualified immunity defense.

The same is true of Lewis. At all times relevant to this case Lewis served as the Statewide Medical Director of the GDC and as the supervisor of its utilization management program.[26] Her only connection to this case is that she directed Eady

---

[25]   ECF 77-1, ¶¶ 12-15; ECF 77, at 15.

[26]   ECF 77, at 4.

to arrange for Riley to be transferred to AMC for care.[27] This action was clearly within Lewis's job responsibilities such that she, too, can invoke a qualified immunity defense. Both Caldwell and Lewis are thus immune unless Plaintiffs can demonstrate that (1) they violated Riley's constitutional rights; and that (2) the unlawfulness of their conduct was clearly established at the time.

Plaintiffs bring a claim for a violation of Riley's Eighth Amendment right to be free from cruel and unusual punishment. U.S. Const. amend. VIII. The Supreme Court has held that, because this prohibits "the unnecessary and wanton infliction of pain," it also prohibits "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble,* 429 U.S. 97, 103–04 (1976). "Federal and state governments [ ] have a constitutional obligation to provide minimally adequate medical care to those whom they are punishing by incarceration." *Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1270 (11th Cir. 2020). Deliberate indifference to a prisoner's serious medical needs is a violation of the Eighth Amendment. *See Estelle,* 429 U.S. at 104. Deliberate indifference, however, is a "steep hill" for Plaintiffs to climb. *Hoffer,* 973 F.3d at 1272.

---

[27]   ECF 77-2, ¶ 28. While Plaintiffs deny that this is the only involvement, they provide no evidence to suggest Lewis had any other involvement in this case.

Demonstrating deliberate indifference requires both an objective and subjective showing. *Id.* at 1270 (citing *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003)). A plaintiff must show that (1) he suffered from an objectively serious medical need and (2) a prison official acted with subjective deliberate indifference to that medical need. *Hoffer,* 973 F.3d at 1270. *See also Harper v. Lawrence Cnty.*, 592 F.3d 1227, 1234 (11th Cir. 2010); *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1326 (11th Cir. 2007). As to step one, a medical need that is objectively serious "is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Goebert,* 510 F.3d at 1326. As to step two's subjective inquiry, the "[p]laintiff must prove three things: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." *Id.* (internal quotation marks omitted). Where the issue is delay rather than an outright refusal of treatment, a plaintiff must show that the official intentionally delayed the provision of medical treatment, knowing that the inmate had a life-threatening condition that would be exacerbated by the delay. *Goebert,* 510 F.3d at 1327. Accidental inadequacy, negligence in diagnosis or treatment, poor exercise of medical judgment, and even medical malpractice do not rise to

the level of deliberate indifference. *See Taylor v. Adams,* 221 F.3d 1254, 1258 (11th Cir. 2000).

Recently, the Eleventh Circuit emphasized the stringency of the deliberate indifference standard: "Medical treatment violates the [E]ighth [A]mendment only when it is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Hoffer*, 973 F.3d at 1271. The question then is not whether a prisoner's medical care was "perfect, the best obtainable, or even very good," but whether it is "so reckless—so conscience-shocking—that it violates the Constitution." *Id*. at 1272. While the Court understands Plaintiffs' frustrations with Riley's level of care, neither Defendants' actions amount to a violation of the Eighth Amendment as a matter of law.

### *i.*   Caldwell is not liable based on his role as supervisor.

Though unclear from the pleadings, it appears that Plaintiffs pursue their § 1983 claim against Caldwell on a theory of supervisory liability. Supervisory officials "are not liable under § 1983 for the unconstitutional acts of their subordinates 'on the basis of respondeat superior or vicarious liability.'" *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999) (quoting *Belcher v. City of Foley*, 30 F.3d 1390, 1396 (11th Cir. 1994)). Rather, "[s]upervisors will be held individually liable only if (1) the supervisor personally participates in the underlying violation; or (2)

there is a causal connection between the actions of the supervisor and that violation." *Mann v. Taser Int'l. Inc.*, 588 F.3d 1291, 1308 (11th Cir. 2009). Importantly, "[t]here can be no policy-based liability or supervisory liability when there is no underlying constitutional violation." *Knight ex rel. Kerr v. Miami-Dade Cnty.*, 856 F.3d 795, 821 (11th Cir. 2017).

The Court concludes that Caldwell cannot be held liable in a supervisory capacity because Plaintiffs have failed to make a sufficient showing that an underlying constitutional violation occurred. As an initial matter, Plaintiffs admit that Caldwell had no supervisory authority over any of the medical staff,[28] so any liability could only arise from his supervision of the other JSP personnel. There is not sufficient evidence to suggest that the staff at JSP acted with deliberate indifference by ignoring Riley's condition.

As noted above, the constitutional standard to show deliberate indifference is extremely high—it must be conscious-shocking. Here, the only evidence Plaintiffs put forth regarding Riley's alleged symptoms prior to October 17 was the deposition and declaration of Robert Lee Carnes, a fellow inmate at JSP and Riley's "neighbor." Carnes testified that, while he told Riley to visit medical at

---

[28]   ECF 77-2, ¶ 37.

some point prior to October 17 based on a change in his behavior, Riley insisted that he did not need to go.[29] A few days later, at Carnes's request, the staff took Riley to the medical unit for a visit, and he was discharged an hour later.[30] Riley did not have a documented history of headaches, and there is no official record of Riley having any neurological issues before October 17, 2017.[31] Riley himself never complained of any issues nor sought out medical treatment on his own (in fact, he denied any need to do so). Assuming Riley had a serious medical need, there is no evidence that anyone in the prison was "grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Accordingly, because the Court finds that no Eighth Amendment violation occurred among the non-medical JSP staff, Caldwell cannot be held liable on a theory of supervisory liability and summary judgment is granted in his favor.

### ii. Lewis did not display deliberate indifference to Riley's serious medical need.

Assuming that Riley had a serious medical need, Plaintiffs have nonetheless failed to submit evidence sufficient to show that Lewis acted with deliberate

---

[29]   ECF 77-3, at 13.

[30]   ECF 77-2, ¶ 37. Carnes testified that Riley returned from this visit with a disciplinary slip for lying, but there is no evidence regarding what that slip actually pertained to or whether it related to his medical trip at all.

[31]   *Id.* ¶ 7.

indifference. "Plaintiff must prove three things: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence."  First, there is no evidence that Lewis knew of the severity of Riley's condition. Eady stated that, on October 19, she "had a conversation" with Lewis to determine where to send Riley for care.[32] Eady did not testify that she conveyed the severity of Riley's condition to Lewis. And, in Lewis's deposition, she testified only that Eady told her "that the physician caring for Mr. Riley wanted to transfer to a higher level of care facility.…"[33] When asked if she was informed of Riley's medical condition during the transfer, Lewis responded 'no.'[34] There is no evidence to suggest that Lewis was made aware of the severity of Riley's condition, nor of the need for immediate transfer—just that he needed to be transferred to a higher level of care facility with brain mapping capabilities.

Second, even assuming Lewis knew of the severe risk Riley purportedly faced, Plaintiffs have failed to make a subjective showing that she disregarded that risk. As noted above, where the issue is delay rather than an outright refusal of treatment, a plaintiff must show that the official intentionally delayed the

---

[32]   ECF 77-6, at 17.

[33]   ECF 77-5, at 26.

[34]   *Id.* at 39.

provision of medical treatment, knowing that the inmate had a life-threatening condition that would be exacerbated by the delay. *Goebert*, 510 F.3d at 1327. Defendants argue that "any delays in Riley's transfer cannot be attributed to Dr. Lewis…because AMC accepted Riley as a patient and continually informed Nurse Eady that they were working on making a bed available."[35] Plaintiffs believe Lewis caused the delay by failing to explore "the possibility of a transfer to Emory once it became clear that transfer to AMC would be delayed."[36] The Court agrees with Defendants.

There is no evidence to suggest that Lewis was even aware of a delay in Riley's transfer. In fact, Plaintiffs do not contest that Lewis's only (direct) involvement in this case was the phone call between herself and Eady on October 19, 2017 in which she directed Eady to send Riley to AMC, where he was accepted for treatment. It was only *after* this call—after Lewis's only direct involvement— that the delay in transferring Riley to AMC manifested.[37] Eady placed multiple calls to AMC to inquire about Riley's transfer, but there is nothing in the record to

---

[35]   ECF 76-1, at 12.

[36]   ECF 77, at 7.

[37]   ECF 77-2, ¶¶ 20–24.

suggest that Lewis was aware of this delay or did anything to cause it.  And, Eady's testimony regarding Riley's hospital placement is telling. She states:

> I remember receiving a call that [Riley] needed to be transferred either to Emory or Augusta for mapping because of his mass. I remember that I had a conversation that we attempted Augusta, they did not provide those services. The next request was Emory. I had a conversation with Dr. Lewis. Dr. Lewis said, Let's see if we can get him to Atlanta Medical. They did accept him. We were waiting on a bed and I communicated back and forth with the hospital.[38]

Eady also testified that her communication about the delay in finding a bed at AMC was between herself and Dr. Henderson at AMC.[39] And, when asked about why she did not check with Emory about an open bed, she responded that she "awaits her direction from Dr. Lewis and that…once he was accepted at AMC, that was the direction that we went."[40]

Lewis's own testimony also supports Defendants' argument that Lewis did not cause a delay in Riley's transfer. When asked to confirm that she did in fact direct Riley's transfer to AMC instead of either AU or Emory, Lewis responded "[t]hat was only when [ ] Eady called to say that AU didn't have that service

---

[38]   ECF 77-6, at 17.

[39]   *Id*.

[40]   ECF 77-6, at 20.

available."[41] Plaintiffs' counsel asked why Lewis did not want Eady to contact Emory, and Lewis responded that she never told Eady not to contact Emory. Rather, her testimony was simply that Eady informed her that AU did not have the brain mapping service and Eady asked her what should be done.[42] It is clear from the record that Eady and Dr. Henderson at AMC knew of the delay, but there is no evidence suggesting this information was conveyed to Lewis. In their brief, Plaintiffs suggest that, once it was clear that no bed was immediately available at AMC, Lewis prevented Eady from attempting to see if there was space available at Emory. However, this timeline is not supported by the record, nor Plaintiffs' response to Defendants' Statement of Material Facts. There is simply no evidence in the record that suggests Lewis was deliberately indifferent by causing a delay in Riley's treatment.

Finally, even assuming that Lewis knew of both the seriousness of Riley's condition and of the delay in his transfer to AMC, there is no evidence that she acted with deliberate indifference in directing his transfer to AMC instead of Emory. "Medical intervention exists along a spectrum. . . . There is [ ] a range of responsible treatment options between the two poles that will satisfy the Eighth

---

[41]   ECF 77-5, at 27.

[42]   *Id*.

Amendment." *Hoffer*, 973 F.3d at 1272. Much like in *Hoffer*, Plaintiffs in this case seem to take the position that it was a constitutional violation not to send Riley to Emory, where he *might* have received faster, superior care. However, the constitution is not offended when inmates do not receive the best care available, particularly when a constitutionally sufficient course of treatment was already in place.

Plaintiffs argue that Lewis's decision to send Riley to AMC was financially motivated.[43] Again, there is no support in the record for this contention. Lewis testified that she selected AMC because it had the brain mapping capabilities and the level of care that Riley required.[44] Additionally, she asserted that she believed AMC would be best because it has a secure ward unit that staffed GDC correctional officers which would make transfer speedy and efficient.[45] Plaintiffs' only response is that "[t]he Georgia Department of Corrections does have a contractual and financial relationship with AMC that provides for medical expenses to be capped."[46] They argue that, because this financial relationship

---

[43]  ECF 77, at 6.

[44]  ECF 77-5, at 27–28.

[45]  ECF 77-2, ¶¶ 30–31.

[46]  *Id.*

exists, Lewis's decision was necessarily financially motivated. There is simply no evidence that this impacted Lewis's decision, and even assuming it did, this is insufficient to rise to the level of deliberate indifference. *Hoffer,* 973 F.3d at 1276 (finding no authority for the "proposition that there is a per se Eighth Amendment prohibition against corrections officials considering cost, even when considered only in the course of selecting treatment that is aimed at attending to an incarcerated person's serious medical needs."). Summary judgment is granted in favor of Lewis as well.

### c.    Remand for the state-law claim is appropriate

"Supplemental jurisdiction" allows federal courts to hear and decide state-law claims along with federal-law claims when they are so related to claims in the action with original jurisdiction that they form part of the same case or controversy. 28 U.S.C. § 1367(a). In the ordinary course, where the only federal claims have been dismissed and the case is before a federal district court solely through supplemental jurisdiction, a court should decline to exercise such jurisdiction. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988). A district court may decline supplemental jurisdiction when one of four conditions is met. Two of those circumstances are where (1) the claim raises a novel or complex issue of state law, and (2) where "the district court has dismissed all

claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). Where "the issues hinge on the proper meaning and reach of state statutes and regulations," it is more appropriate to allow the state to interpret its own law. *Diversified Servs., Inc. v. Simkins Indus., Inc.,* 974 F. Supp. 1448, 1455 (S.D. Fla. 1997).

Here, two justifications exist for declining to exercise supplemental jurisdiction, each of which is independently sufficient. First, in this Order the Court has now granted summary judgment on the only federal claim in this case. The remaining claim is one over which this Court has no original subject matter jurisdiction. Additionally, and more importantly, the parties disagree about the application of sovereign immunity as to the remaining claim. Specifically, they argue about the appropriateness and meaning of the discretionary exception under O.C.G.A. § 50-21-24(2) as well as the distinction between discretionary and ministerial duties and how those differences are relevant to this case. The only remaining claim is a state-law claim which would require this Court to interpret and settle a dispute over the scope of Georgia's immunity laws. Further, this Court has no opportunity to remand this case at an earlier stage, as no Motion to Dismiss was filed in this Court. Accordingly, the Court finds that it is appropriate to remand this action to the state court for further proceedings on Plaintiffs' Georgia Tort Claims Act negligence claim against the GDC.

IV.     **CONCLUSION**

The Court **GRANTS IN PART AND DENIES WITHOUT PREJUDICE** the remainder of Defendants' motion for summary judgment [ECF 76]. The Clerk is **DIRECTED** to **REMAND** this case to Fulton County State Court for further proceedings.

SO ORDERED this 31st day of March, 2023.

Steven D. Grimberg
United States District Court Judge